UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED

98 FEB 23 PM 3: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

EQUAL EMPLOYMENT OPPORTUNITY      )
COMMISSION,                       )
                                  )
      Plaintiff,                  )
                                  )
vs.                               )      Civil Action No. CV97-S-235-M
                                  )
THE HEIL COMPANY,                 )                ENTERED
                                  )
      Defendant.                  )
                                         FEB 2 4 1998

### MEMORANDUM OPINION

The Equal Employment Opportunity Commission commenced this
action on behalf of a third party, Tracey Padgett. Allegedly, the
Heil Company "regarded" Mr. Padgett as disabled and terminated his
employment in violation of the Americans with Disabilities Act of
1990, 42 U.S.C. §§ 12101 et seq. The action is before this court
on a motion for partial summary judgment by the EEOC and a motion
for summary judgment by the Heil Company. Upon consideration of
the pleadings, briefs, and evidentiary submissions, this court
concludes plaintiff's motion is due to be granted in part, but
denied in part; and, defendant's motion is due to be denied.

### I. FACTS

The Heil Company's Fort Payne, Alabama facility manufactures
certain components of garbage trucks. Tracey Padgett worked at
that facility from April 24, 1990 until April 4, 1993. He welded
the sides and floors of garbage containers. (Plaintiff's
deposition at 64.) Such duties required bending, stooping,

30

lifting, crawling, and working in awkward positions. (Genelin deposition at 20.)

During January of 1993, Mr. Padgett injured his back while preparing for work, and the resulting pain caused him to miss several days of work. He was examined by Dr. Donald Deinlein, who diagnosed two herniated discs. Dr. Deinlein released Padgett to return to work with no restrictions after two weeks of therapy. (Deinlein deposition at 19.)

Even so, the Heil Company required Padgett to obtain a second evaluation from Dr. Timothy Decker, a doctor of osteopathy who allegedly was more familiar with job requirements at the Heil plant.[1] (Genelin deposition at 32; Padgett deposition at 100.) Dr. Decker refused to release Padgett to return to work, because the lifting, bending, and twisting requirements of the welder position allegedly placed him in danger of further injury. (Decker deposition at 11, 13-14.) Subsequently, Padgett secured releases to return to work with no restrictions from two neurosurgeons, Dr.

---

[1]There are indications in the record that Dr. Decker was Heil's "company physician":

> We had an informal arrangement with [Dr. Decker] in which he agreed to see patients if we sent them to him when they had a worker's comp injury[;] to review any injuries as we had described before that would have occurred off duty and before they came back to work[;] to come out to our plant periodically to walk through for a couple of things. To familiarize himself with what's going on in the plant, the jobs themselves specifically and then also to advise us with regard to medical supplies, the training of our emergency medical people and the compliance with emergency medical laws out there.

(Danner deposition at 15-16.) Under that "informal arrangement," Dr. Decker treated all Heil employees who suffered on-the-job injuries (Decker deposition at 9), and human resources manager Linda Ellis identified him as Heil's "company doctor." (Ellis deposition at 24.)

2

Zenko Hrynkiw and Dr. Randolph George. (Hrynkiw deposition at 15-16; George deposition at 10.) Nevertheless, defendant persisted in its refusal to allow Padgett to work. That refusal was based solely on Dr. Decker's evaluation. The Heil Company's plant manager, Kevin Genelin, conferred with Dr. Decker and concluded there were no positions at the Heil Company facility that Padgett could perform. (Genelin deposition at 56, 75, 100-01.) Human resources manager Linda Ellis concurred in that conclusion, because the lifting, pushing, and pulling requirements of plant jobs foreclosed continued work by Padgett. (Ellis deposition at 41, 52, 53.)

Thus, on April 4, 1993, Padgett was "laid off" for lack of work he could safely perform, and because no accommodations could be identified. (Genelin deposition at 69-70; Ellis deposition at 41.) The Heil Company stresses that Padgett's employment was not "terminated," because he retained certain "recall rights," which might allow preferences in hiring if a job ever became available within his alleged restrictions. (Danner deposition at 29-30.)

Since his "lay off," Padgett has worked in other manual labor jobs, including welder positions. (Padgett deposition at 16-18, 27-58.) He currently is employed as a welder, in a position which requires welding pumps and hoists, and installing plumbing on trucks. (Id. at 51-52.) He subsequently has lifted pieces of steel weighing 75 pounds and used a crane to move steel walls. (Id. at 55-56.)

3

Defendant's corporate representative, Jack Danner (the Heil Company's corporate director of human resources), testified that Padgett's restrictions, as communicated by Dr. Decker, limited his work to performing clerical or office jobs. (Danner deposition at 46, 47.) Specifically, Padgett allegedly can not perform the following jobs at Heil's Fort Payne plant: machine operator, mounter, painter, grinder, washer, maintenance worker, or welder assembler. (*Id.* at 56-59.) Padgett effectively is foreclosed from approximately 99% of the positions at the facility. (*Id.* at 60.)

Human resources manager Linda Ellis testified that there were no jobs Padgett could perform, including clerical jobs. (Ellis deposition at 53-54.)

Plant manager Kevin Genelin believed that Padgett only could work in an office position, sitting at a desk, in a position that required very limited bending or stooping. (Genelin deposition at 97-99.)

Vocational specialist Mary House Kessler, Ph.D., interviewed and evaluated Padgett on July 15, 1997. (*See* plaintiff's exhibit 16.) She concluded that Heil's job description for the welder position placed its exertional requirements in a "medium" category. (Plaintiff's exhibit 16 at 6.) She also found that Padgett's limitations, as perceived by defendant, prevented him from working in the broad ranges of heavy, medium, and light jobs. (*Id.* at 7.) As perceived by defendant, Padgett only could work in approximately 3% of all jobs in the state. (*Id.*)

4

## II.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis supplied.)  The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case.  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(per curiam).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *Celotex*, 477 U.S. at 324, 106 S.Ct. 2553.  When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also,

5

to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston,* 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Augusta Iron & Steel Works v. Employers Ins. of Wausau,* 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery,* 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52, 106 S.Ct. at 2512.

6

### III.  DISCUSSION

#### A.  Prerequisites to Suit

The EEOC seeks summary judgment on the legal issue of its right to commence the present action.

> If within thirty days after a charge is filed with the Commission ..., the Commission has been unable to secure from respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent ... named in the charge.

42 U.S.C. § 2000e-5(f)(1).  Defendant does not dispute that the prerequisites to the EEOC's commencement of this action have been met.

Tracey Padgett filed a charge of discrimination by Heil with the EEOC on July 19, 1993.  (Plaintiff's exhibit 1.)  The EEOC issued a determination on the merits of that charge, and attempted to conciliate the dispute between Padgett and the Heil Company. (Defendant's answers to requests for admissions ¶¶ 1, 4, 5.)  The EEOC determined that conciliation efforts were unsuccessful on September 5, 1996 (plaintiff's exhibit 3), and commenced this action on January 29, 1997.  This court thus finds that the prerequisites to suit by the EEOC have been met, and the EEOC is entitled to partial summary judgment on that issue.

#### B.  ADA Discrimination

Congress passed the Americans with Disabilities Act for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  Congress sought "to

7

assure equality of opportunity, full participation, independent living, and economic self-sufficiency." 42 U.S.C. § 12101(a)(8). To achieve those purposes, the Act commands that

> no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Thus, the EEOC bears the burden of proving, by a preponderance of the evidence, that defendant intentionally discriminated against Padgett because of a disability. That can be done either by direct or circumstantial evidence. In this action, the EEOC contends there is direct evidence of disability discrimination, because Heil found there were no jobs at its facility which Padgett could perform. (Plaintiff's brief in support of summary at 21.) Indeed, Heil relied upon Dr. Decker's refusal to release Padgett for work when it decided to lay him off. (Genelin deposition at 55-56; Ellis deposition at 23-24, 40-41.)

The EEOC relies upon precedent based upon Title VII of the Civil Rights Act of 1964 to argue that, when a plaintiff produces direct evidence of a discriminatory animus for the challenged employment decision, the burden shifts to a defendant to prove that discrimination did not occur. (Id. (citing Wall v. Trust Co., 946 F.2d 805 (11th Cir. 1991).) Unlike Title VII cases in which race or gender will almost never be an acceptable reason for an

8

employment decision, however, the ADA permits an employer to make a decision based upon a disability, so long as the disability is not the sole reason for the decision. *See Mitchell v. Crowell*, 975 F. Supp. 1440, 1446-47 (N.D. Ala. 1997)(Rehabilitation Act case); *Monette*, 90 F.3d at 1180. In other words, an employer may consider an employee's disability in making an adverse job decision, when the employer determines that the employee is not "qualified," with or without reasonable accommodation, to perform the essential functions of the job position that employee holds or seeks. *Monette*, 90 F.3d at 1180.

> To sum up, if the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision, or if the employer admits reliance on the handicap:
>
> 1) The plaintiff bears the burden of establishing that he or she is "disabled."
>
> 2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged "essential" job requirement eliminated; or c) with a proposed reasonable accommodation.
>
> 3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Monette*, 90 F.3d at 1186.    The EEOC, therefore, must prove that Padgett was disabled, and that he was "otherwise qualified" for the position of welder.

9

### 1. Disability

The ADA defines the concept of "disability" in a manner that includes any individual:

(A) who has a *physical or mental impairment* that *substantially limits* one or more of the *major life activities* of such individual, or

(B) who has a *record of* such an impairment, or

(C) who is *regarded as having* such an impairment.

*See* 42 U.S.C. § 12102(2). In this action, the EEOC proceeds under the third prong of that definition, and argues that Padgett was "regarded as having" "a physical or mental impairment that substantially limits one or more of [his] major life activities."

The EEOC Interpretive Guidance lists three different ways in which an individual may satisfy the definition of "being regarded as having a disability":

(1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;

(2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

(3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

29 C.F.R. Pt. 1630, App. § 1630.2(1), at 404. The EEOC focuses upon the first category, and claims that Padgett's herniated discs constitute an impairment which is <u>not</u> substantially limiting, but

10

which defendant <u>perceived</u> as substantially limiting Padgett's major life activity of working.

The determination of whether an employer "regarded" an employee as substantially limited in the ability to work is a mixed question of law and fact. *Bridges v. City of Bossier*, 92 F.3d 329, 333 (5th Cir. 1996). "The underlying factual question is how many and which jobs involve [plaintiff's perceived restrictions]," while "[t]he legal issue presented ... is whether disqualification from [those] jobs involving [plaintiff's restrictions] constitutes a substantial limitation on the major life activity of working." *Id.* at 333, 334.

In resolving the factual issue, the EEOC must present specific evidence that Padgett's restrictions, as perceived by the Heil Company, prevented him from performing either an entire class of jobs, or a broad range of jobs in various classes. *See id.* at 333 ("we can rule out most of the jobs listed by [plaintiff] because of a lack of record evidence. [Plaintiff] points to no record evidence that law enforcement personnel are routinely exposed to extreme trauma, and we find none").

Once the court determines "how many and which jobs" involve Padgett's perceived restrictions, it must determine if disqualification from those jobs would constitute a substantial limitation on the major life activity of working. *Id.* at 334.

To meet its burden on the factual issue, the EEOC relies upon the testimony of defendant's employees and Dr. Mary House Kessler.

11

The Heil Company's corporate representative, Jack Danner, testified
that, based upon his knowledge of Padgett's restrictions, Padgett
could not perform 99% of the job's at its facility, and was limited
to clerical and office positions. (Danner deposition at 4, 56,
60.) Linda Ellis, defendant's human resources manager, testified
there were no jobs in the plant that Padgett could perform,
including clerical work. (Ellis deposition at 52-53.) Rather, she
believed Padgett was limited to light work with his hands. (*Id.* at
54.) Finally, plant manager Kevin Genelin testified that Padgett
could perform no jobs in the plant, and was limited to performing
office work. (Genelin deposition at 84.)

Dr. Mary House Kessler relied upon Jack Danner's testimony
during her evaluation of Mr. Padgett:

> The Heil Company perceived Mr. Padgett as unable to
> perform the job duty for his employment as a welder after
> his injury. In his deposition, Mr. Jack Danner listed
> jobs which Mr. Padgett was not able to perform. They
> included the very heavy job of maintenance worker, the
> heavy job of machine operator, the medium job of painter,
> and the light job of grinder. It is my conclusion,
> therefore, that Mr. Danner perceived Mr. Padgett as
> unable to perform any type of work above that of the
> sedentary level.
>
> . . .
>
> With the perception of his back injury, he was perceived
> as having lost the ability to perform the broad ranges of
> heavy, medium and light jobs. The perception of Mr.
> Padgett's inability to perform work which requires him to
> bend and crouch frequently also restricts him from
> working in a broad range of jobs. If Mr. Padgett is
> unable to bend or crouch frequently, he loses access to
> 21,078 additional jobs within the classes of light,
> medium, and heavy. Many of the jobs to which Mr. Padgett
> is perceived as unable to perform require the same or

12

similar training.  Representative classes and numbers of jobs requiring the same or similar training are as follows:

machinist 9,916
percision [sic] grinders, fitters, and sharpeners 386
sheet metal workers 2,940
mechanics and repairers 9,311

. . .

Mr. Padgett is able to perform approximately forty-five percent (45%) of the jobs within the state of Alabama with his ability to perform a full range of heavy, medium, light, and sedentary jobs.  When he is perceived to have lost access to heavy, medium, and light jobs with no sustained bending or crouching, he is perceived as being disabled from most of those jobs and has the residual ability to perform little more than three percent (3%) of the jobs in the state.

(Plaintiff's exhibit 16 at 6-7.)    That evidence resolves the factual issue of "how many and which jobs" involve Padgett's perceived restrictions.

In response to plaintiff's argument, and in support of its own motion for summary judgment, defendant makes three arguments that Padgett was not "regarded as" disabled.  First, defendant states that "[n]ot everyone who is unable to perform functions of their jobs is considered 'disabled.'" (Brief in opposition to summary judgment at 2.)    This court is not certain how that argument helps to determine if Padgett was "regarded as" disabled. Nevertheless, the cases cited by defendant affirm summary judgment when plaintiff fails to present sufficient evidence of a perceived disability. *See Burgard v. Super Valu Holdings, Inc.*, No. 96-1199, 1997 WL 278974 at *3 (10th Cir. May 27, 1997)(unpublished opinion);

13

*Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1319-20 (8th Cir. 1996); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727-28 (5th Cir. 1995).  Unlike the plaintiffs in those cases, however, the EEOC has here supplied this court with substantial evidence demonstrating that Padgett was "regarded as" disabled by the Heil Company.

Next, defendant argues that "an employer's belief that an employee is unable to perform one task with adequate safety margins does not establish per say [sic] that the employer regards the employee as having a substantial limitation to work in general." (Defendant's brief in opposition to summary judgment at 2 (quoting *Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir. 1993).)  The sentence following that contention is self-defeating: "plaintiff was precluded from a welder's position, and from those in grinding, painting, fabrication, and mount shop." (*Id.*)  Thus, defendant's own argument reinforces the idea that it regarded plaintiff as unable to perform a broad range of jobs in various classes.

Finally, defendant argues that it did not regard Padgett as substantially limited in the major life activity of working, because "the opinion of the then-plant manager as to Padgett's abilities was confined to jobs in the Heil plant that Padgett was qualified for." (*Id.* (emphasis supplied).)  Plant manager Kevin Genelin's testimony establishes that he regarded Padgett as able to perform only clerical jobs, however. (Genelin deposition at 84.)  Even though Genelin's testimony was limited to the Heil Company

14

plant, it is sufficient to determine that the Heil Company regarded Padgett as unable to perform a broad range of jobs.

This court therefore finds defendant's arguments unpersuasive. Moreover, plaintiff has presented unrebutted vocational evidence and testimony from defendant's employees establishing that the Heil Company perceived Padgett as foreclosed from employment in the broad ranges of heavy, medium, and light duty work. In resolving the legal issue, this court finds that disqualification from the broad ranges of heavy, medium, and light duty work would constitute a substantial limitation on the major life activity of working. Consequently, this court finds that Tracey Padgett was "regarded as" disabled, and plaintiff is entitled to partial summary judgment on the issue of Padgett's disability.

## 2. Was Padgett a "Qualified Individual"?

Plaintiff also seeks summary judgment on the issue of Padgett's status as a "qualified individual": i.e., one who could perform the essential functions of the job he holds or seeks, with or without reasonable accommodation being made by the employer.[2] Defendant makes no explicit argument that Padgett was not a "qualified individual," but claims that Padgett was a "direct

___

[2] 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). See also 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

15

threat": *i.e.*, one whose condition threatened his own safety.[3] Such an argument challenges Padgett's qualifications. *See Rizzo v. Children's World leaning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir. 1996) ("An employee who is a direct threat is not a qualified individual with a disability"); *Jones v. New York City Housing Authority*, No. 96-7203, 1996 WL 537915 (2d Cir. Sept. 24, 1996) (plaintiff "was not otherwise qualified" when he posed a direct threat); *Najera v. State of California-Prison Industry Authority*, No. 94-55937, 1995 WL 309884 at *3 (9th Cir. May 22, 1995) (plaintiff "was not qualified to return because he posed a danger to PIA employees").

The Eleventh Circuit holds that "[a]n employer may fire a disabled employee if the disability renders the employee a 'direct threat' to his own health or safety." *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996) (emphasis supplied). Moreover, "[t]he employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available." *Id.*

The EEOC regulations provide the following instruction for determining whether an employee poses a "direct threat."

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the

---

[3] "The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

16

most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r). In addition, the EEOC's Interpretive Guidance provides the following insight:

An employer is also permitted to require that an individual not pose a direct threat of harm to his or her own safety or health. If performing the particular functions of a job would result in a high probability of substantial harm to the individual, the employer could reject or discharge the individual unless a reasonable accommodation that would not cause an undue hardship would avert the harm. ...

The assessment that there exists a high probability of substantial harm to the individual, like the assessment that there exists a high probability of substantial harm to others, must be strictly based on valid medical analyses and/or on other objective evidence. This determination must be based on individualized factual data, using [the four factors of 29 C.F.R. § 1630.2(r)], rather than on stereotypic or patronizing assumptions and must consider potential reasonable accommodations. Generalized fears about risks from the employment environment, such as exacerbation of the disability caused by stress, cannot be used by an employer to disqualify an individual with a disability. ...

29 C.F.R. Pt. 1630, App. § 1630.2(r), at 409.

To carry its burden of demonstrating that Padgett was not a direct threat, the EEOC relies upon the testimony of three

17

physicians who treated Padgett. Dr. Zenko Hrynkiw testified that Padgett's neurological exam was normal, which was "as good as it gets." (Hrynkiw deposition at 20.) Thus, Dr. Hrynkiw "felt that he should be able to do whatever he did ...." (*Id.*)

Dr. Donald Deinlein concluded that Padgett "was capable ... of doing what he normally did." (Deinlein deposition at 22.)

Dr. Randolph George testified that Padgett was at a "fairly low risk" of injuring himself in a light duty job, and "the chances would be low" that Padgett would injure himself in a medium duty position. (George deposition at 19, 20.)

In response, the Heil Company relies upon the testimony of Dr. Timothy Decker, who believed that Padgett "was at a significant risk of substantial harm." (Decker deposition at 21; see also the statutory definition of "direct threat" at note 3 *supra*.) Dr. Decker testified to three of the four factors suggested by the EEOC regulations:

> (1)  the duration of the risk would continue "[u]ntil [Padgett's] back was fixed" by surgical intervention. (*Id.* at 23-24.)
>
> (2)  the nature and severity of the potential harm involved potential "permanent and irreversible spinal cord or nerve root damage." (*Id.* at 21-22.)
>
> (3)  the likelihood of harm was "high." (*Id.* at 25.)

Dr. Decker offered no testimony on the imminence of harm upon Padgett's return to work, but considered Padgett's employment

18

"risky," with further injury "highly certain." (*Id.* at 27, 28, 29.)

This court takes a jaundiced view of Dr. Decker's testimony, because he is a family practitioner who lacks an M.D. When placed on the scales of evidence, Dr. Decker's opinion on the necessity of surgery is heavily outweighed by those of two neurosurgeons (Dr. Hrynkiw and Dr. George) and an orthopedic surgeon (Dr. Deinlein). Moreover, it appears that Dr. Decker's opinion was not based completely on concern for Padgett's health: rather, he had at least one eye cocked in the direction of potential liability for both himself and the Heil Company.[4]

Thus, if this court could assess credibility and weigh evidence, it would find the present issue in favor of the EEOC; but, it cannot. *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996)("It is not the court's role to weigh conflicting evidence or make credibility determinations") Rather, this court must view the credibility of witnesses, and all other evidence, in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505,

---

[4]Dr. Decker gave the following deposition testimony:

> I have met with these specialists before, and when you tell them, or when they come up they see, then they understand, but you have to understand their perspective. They don't want to be in court, either. You know, they don't want to say, "No, you can't go to work." You know, it all has to stop somewhere and, basically, at my gate, and I do it to protect the patient. Ultimately, they can do whatever they have to do to try ad get the job, but I know my liability if I put them back and they get hurt, and the employer's liability. If you knowingly put a patient to work with a herniated disk and he sneezes wrong and he blows the disk out, who's liable? The employer is liable.

(Decker deposition at 40-41 (emphasis supplied).)

19

2513, 91 L.Ed.2d 202 (1986).  Consequently, this court finds there is conflicting medical testimony creating genuine issues of material fact on Padgett's status as a "direct threat" to his own safety.    Thus, this court cannot grant summary judgment for plaintiff or defendant on the issue of Padgett's qualifications for the position of welder.

### IV.  CONCLUSION

For the foregoing reasons, this court concludes that the EEOC is entitled to summary judgment on the following issues:  (1) satisfaction of the prerequisites to suit; and, (2) proof that Padgett was "regarded as" substantially limited in the major life activity of working.  Plaintiff's motion for summary judgment is due to be denied on the issue of whether Padgett was a "qualified individual" with a disability.  Defendant's motion for summary judgment is due to be denied.

DONE this the 23rd day of February, 1998.

United States District Judge

20